**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

---

**No. 23-3401**

---

S.A., NEXT FRIEND ANGI ALLEN; L.A., NEXT FRIEND ANGI ALLEN;
H.B., NEXT FRIEND JULIE BEANER; AD.S., NEXT FRIEND BRYAN SCHAVE AND
BRANDI SCHAVE; AL.S., NEXT FRIEND BRYAN SCHAVE AND BRANDI SCHAVE;
S.D., NEXT FRIEND JENNIFER DEGROOT AND PHILIP DEGROOT;
A.L., NEXT FRIEND NATHAN LEUNING; M.B., NEXT FRIEND JOSEPH
BILDERBACK; M.D., NEXT FRIEND DAVID DENSON; M.W., NEXT FRIEND
EUGENE WARE AND MARSHA WARE; KA, NEXT FRIEND CATHY ANDERSON;
R.T., NEXT FRIEND LUKE TIBBETTS AND BOBBIE TIBBETTS,

Plaintiffs – Appellees,

vs.

SIOUX FALLS SCHOOL DISTRICT 49-5,

Defendant – Appellant,

JANE STAVEM, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT;
CASEY MEILE, IN HIS OFFICIAL CAPACITY AS COORDINATOR OF ATHLETICS
FOR THE SIOUX FALLS SCHOOL DISTRICT NO. 49-5,

Defendants.

---

APPEAL FROM THE U.S. DISTRICT COURT FOR THE DISTRICT OF
SOUTH DAKOTA – SOUTHERN DIVISION
(4:23-cv-04139-CBK)

---

# ADDENDUM OF APPELLANT

---

Reece M. Almond
DAVENPORT EVANS HURWITZ & SMITH LLP
206 West 14th Street
PO Box 1030
Sioux Falls, SD 57101-1030
Telephone: (605) 336-2880
*Attorneys for Defendant-Appellant*

Claire E. Wilka
CADWELL SANFORD DEIBERT & GARRY LLP
200 East 10th Street, Suite 200
Sioux Falls, SD 57104
Telephone: (605) 336-0828
*Attorneys for Plaintiffs-Appellees*

Appellate Case: 23-3401     Page: 1     Date Filed: 12/18/2023 Entry ID: 5345292

# TABLE OF CONTENTS

Item                                                                                    Page

Memorandum Opinion and Order Granting Preliminary Injunction………001

Affidavit of Jane Stavem, Ed.D……………………………………………023

Appellate Case: 23-3401     Page: 2     Date Filed: 12/18/2023 Entry ID: 5345292

Appellate Case: 23-3401     Page: 3     Date Filed: 12/18/2023 Entry ID: 5345292

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| S.A., L.A., H.B., AD.S., AL.S., S.D., A.L., M.B., M.D., M.W., K.A., R.T., <br><br> Plaintiffs, <br><br> vs. <br><br> SIOUX FALLS SCHOOL DISTRICT 49-5; DR. JANE STAVEM, in her official capacity as Superintendent of the Sioux Falls School District 49-5, and CASEY MEILE, in his official capacity as Coordinator of Athletics for the Sioux Falls School District No. 49-5 <br><br> Defendants. | 4:23-CV-04139-CBK <br><br> MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION |

This matter is before the Court on Plaintiff's S.A, L.A., H.B., AD.S., AL.S., S.D., A.L., M.B., M.D., M.W., K.A., and R.T. ("Plaintiffs") motion for a temporary restraining order and preliminary injunction to enjoin the Defendants, Sioux Falls School District 49-5 ("the District") from eliminating the District's gymnastics program on the basis that eliminating the gymnastics program violates 20 U.S.C §1681 ("Title IX"), and Plaintiffs Fourteenth Amendment Equal Protection rights. Doc. 1 at 2. Pursuant to both parties' stipulation and agreement, this matter was heard and decided by the Court on written submissions alone, and oral arguments held October 10, 2023. Doc. 14.

Date Filed: 12/18/2023   Entry ID: 5345292

Page: 4

Appellate Case: 23-3401

## BACKGROUND

Plaintiffs are enrolled students within the District's gymnastics program or have an interest and intent to participate in the gymnastics program. Doc. 1 at 4. On April 11, 2023, the District at a school board meeting disseminated a proposed budget for the 2023-24 school year which cut the gymnastics program's funding of $76,094 and eliminated the program. Doc. 4 at 4, Doc. 5 Ex. 11 at 1. The plaintiffs, along with their parents, attended the meeting and objected to the elimination of the gymnastics program. Doc. 4 at 4.

On April 24, 2023, the District officially adopted the proposed budget eliminating the gymnastics program. Id. at 8, Doc. 17 at 5. Again, the plaintiffs, along with their parents, attended the meeting and objected to the elimination of the gymnastics program and warned that the elimination of the gymnastics program may violate Title IX. Doc. 4 at 4.

On April 25, 2023, parents of plaintiffs, reached out to the Office of Civil Rights (OCR) of the Department of Education (DOE) concerned about a potential Title IX violation. Doc. 19 at 27. After corresponding with a slow to respond OCR, one of the parents, Agni Allen, filed a formal Title IX complaint against the District on May 23, 2023. Id. Over the following months the OCR continued to be slow to respond while they evaluated the claim. Id.

In the meantime, on July 10, 2023, the District approved the final 2023-24 school year budget which allocated $3,644,163 to athletic programs and eliminated the gymnastics program. Doc. 17 at 5, Doc. 5 Ex. 14 at 26. The District stated gymnastics was eliminated because 1) there was a decline in female participation in the sport, 2) an inability to find and retain coaches, 3) the financial burden of the program, 4) difficulty scheduling busing to competitions, and 5) a high interest in participating in other sports. Doc. 17 at 2, 22.

2

The District later put the gymnastics program's equipment up for sale with bidding closing on Sept. 11, 2023. Doc. 4 at 22. With a slow responding OCR, and desire to preserve the gymnastics program, the parents of plaintiffs retained counsel and filed this claim Sept. 12, 2023, requesting a preliminary injunction preventing the sale of the equipment and reinstatement of the gymnastics team. Doc. 19 at 27.

The District is a public school district which receives federal funding and has a student enrollment of 51.05% to 48.95% male to female students, or 3,761 to 3,606 respectively. Doc. 17 at 13. In 2022-23 the numbers show 1,742 males and 1,229 females had participated in the District sports programs. Doc. 18 Ex. B at 1. There was a 7.6% deviation in the level of female enrollment compared to the level of female participation in athletics within the District. Doc. 17 at 13. This means 441 additional female participants, or 460 fewer male participants were needed in athletics to achieve exact proportionality with enrollment. Id. In 2022-23 the breakdown of participation of each sport by gender was:

> Cross Country 102 male, 40 female; Golf 119 male, 69 female; Soccer 158 male, 161 female; Tennis 90 male, 71 female; Track & Field 479 male, 264 female; Basketball 232 male, 139 female; Wrestling 106 male, 25 female; Football 454 male, 1 female; Softball 0 male, 96 female; Volleyball 0 male, 167 female; Competitive Cheer 1 male, 80 female; Competitive Dance 1 male, 59 female; Gymnastics 57 female; Total: 1742 male, 1229 female.

Doc. 17 at 13, Doc. 18 Ex. B at 1.

Since 2008 the District has added five female sports: competitive cheer, competitive dance, soccer, wrestling, and softball. Doc. 17 at 4. In 2021 the District conducted a survey to measure students' interest and participation level in sports offered and potentially offered by the District. Doc. 24 Ex. 2. As a result of this, the District stated in oral arguments that the District started offering girl's wrestling and softball in 2021 and 2022 respectively. Doc. 18 Ex. A. The survey recorded 113 responses

interested in or participating in gymnastics, 44 responses interested in or participating in girls wrestling, 107 responses and 87 responses interested in Fall and Spring softball respectively. Doc. 24 Ex. 2.

Since 2004 the discrepancy between female athletes and their enrolment levels has trended downward from 12.2% in 2004-05 to 7.6% in 2022-23, with a low point of 4.7% in 2015-2016. Doc. 18 Ex. A. Participation in the gymnastics program has fluctuated over the years, peaking in the 2015-16 school year at 133 participants and has declined to 57 participants in 2022-23. Doc. 18 Ex. B at 1, 8.

## ANALYSIS

I.      Standard of Review: Law of Preliminary Injunction

A preliminary injunction is an equitable remedy whose purpose is to prevent future acts that may result in irreparable injury, loss, or damage to the parties involved by preserving the status quo. Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). A preliminary injunction balances the equities between the parties as the litigation moves onto future stages. Dataphase, 640 F.2d at 109. The analysis for granting a preliminary injunction rest upon a four-factor balancing test set forth in Dataphase. Id. at 113. The four factors are:

  (1) the threat of irreparable harm to the movant;

  (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

  (3) the probability that movant will succeed on the merits; and

  (4) the public interest.

Id. It is the movant's burden to establish the necessity of a preliminary injunction under the four-factors. Baker Electric Co-op., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994).

The 8th Circuit states that the fundamental question when considering a preliminary injunction is "whether the balance of equities so favors the movant that

4

Date Filed: 12/18/2023   Entry ID: 5345292   Page: 6   Appellate Case: 23-3401

justice requires the court to intervene to preserve the status quo until the merits are determined." Dataphase, 640 F.2d at 113. Due to the equitable nature of the relief, the 8th Circuit has rejected applying a mathematical formula when evaluating a movant's probability of success on the merits under the third factor. Id. The 8th Circuit explains "in balancing the equities no single factor is determinative…" and that the likelihood the movant will ultimately prevail must be examined in the context of the relative injuries to the parties and the public. Id.

> "If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less."

Id. Thus, the 8th Circuit concludes, a court is not required at an early stage to conduct a mathematical analysis of the merits of the case. Id.

That is, however, unless the balance of equities is equal between the parties. Id. When the factors do not favor one party, a careful analysis of the potential success on the merits is needed. Id. When the four factors favor the movant, then the preliminary injunction should be granted "if the movant has raised questions so serious and difficult as to call for more deliberate investigation. Id.

Finally, while the 8th Circuit tells us that "no single factor is determinative…," the 8th Circuit has reversed a preliminary injunction when the district court did not find the movant had a "substantial probability" of success on the merits. Id. at 114. Thus, if plaintiffs cannot show a "substantial probability" of success on the merits their request for preliminary injunction should be denied. Id. at 114, 114 n9.

Appellate Case: 23-3401   Page: 7   Date Filed: 12/18/2023 Entry ID: 5345292

II.     Factor One: Threat of Irreparable Harm to the Movant

The Court finds the plaintiffs have shown they would suffer irreparable harm if the preliminary injunction were not granted.

"Harm is irreparable if legal remedies, such as monetary damages, are inadequate to address the harm. Thus, 'economic loss does not, in and of itself, constitute irreparable harm' because the party suffering the economic loss can receive full compensation through monetary damages." Breadeaux's Pisa LLC v. Beckman Bros. Ltd., 599 F.Supp.3d 826, 830 (W.D. Mo. 2022) (*citing* Sampson v. Murray, 415 U.S. 61, 88 (1974) and *quoting* Iowa Util. Bd. v. F.C.C., 109 F.3d 418, 426 (8th Cir. 1996)). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Iowa Util. Bd., 109 F.3d at 425. "College students suffer irreparable harm when they are denied the opportunity to play sports." Portz v. St. Cloud State University, 401 F.Supp.3d 834, 868 (D. Min. 2019) (*citing* McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck, 370 F.3d 275, 302 n. 25 (2d Cir.2004) (collecting cases))("Portz II").

Plaintiffs will face the irreparable harm of 1) losing the ability to participate in gymnastics and 2) possibly the denial of equal protection under Title IX.

While the litigation goes forward, without a preliminary injunction, the plaintiffs will suffer the irreparable harm of losing the ability to participate in gymnastics. The District has already cut the gymnastics program from the 2023-2024 budget and has requested bids for the sale of the gymnastic program's equipment. Doc. 4 at 22, Doc. 5 Ex.14. Even if plaintiffs end up winning on the merits, without a preliminary injunction the plaintiffs will not be able to practice or compete in the upcoming gymnastics season set to begin October 30, 2023. Doc. 4 at 2. Money cannot retroactively fix this harm, making it irreparable. This is supported by other district courts within the 8th Circuit that agree that athletes suffer irreparable harm when they cannot participate in their sport while Title IX litigation is ongoing. Portz II, 401 F.Supp.3d at 868.

6

Plaintiffs may also suffer from unequal treatment, in violation of Title IX. As discussed below, plaintiffs have a substantial probability of success on the merits. If plaintiffs succeed on the merits but are not granted a preliminary injunction, they will suffer a temporary violation of Title IX. While temporary, they would have no recourse against the District for the violation. "Title IX does not provide for any monetary damages; thus, plaintiffs can receive either an injunction or nothing at all." Portz II, 401 F.Supp.3d at 868. Therefore, "Plaintiff's expectation that they may be treated unequally in violation of Title IX's terms is an irreparable harm." Portz v. St. Cloud State University, 196 F.Supp.3d 963, 973 (D. Min. 2016) ("Portz I").

III.    Factor Two: Balance of Harm Between Movant on Non-Movant

The Court finds that the plaintiffs have shown the balance of harm leans in their favor because they may well face unequal treatment in violation of Title IX, and the administrative burden in continuing to operate the gymnastics program is minimal.

The second factor seeks to balance the harm and injury granting the injunction will inflict on other parties with the harm that not granting the injunction will inflict upon the movant. Dataphase, 640 F.2d at 113.

The harm the District will face in granting the preliminary injunction is 1) the expenditures and administration of the gymnastics program and 2) foregoing the sale of the gymnastics equipment. The District argues they would have difficulty reallocating resources for the gymnastics program, hiring coaches, and would have to reschedule busing and competition for the gymnastics program. The Court finds these arguments unpersuasive, as the preliminary injunction merely continues the "status quo" of the over one-decade operation of the gymnastics team. Doc. 17 Ex. A, B. Additionally, plaintiffs have provided affidavits of qualified gymnastics coaches willing to coach the program, thus negating the District's assertion there are no gymnastics coaches to hire. Doc. 21, 22. The District also stated during oral arguments that scheduling bussing for athletics is a problem for all sports and is not a problem unique to gymnastics. Finally, the plaintiffs have timely filed this issue allowing time to schedule practices, competitions, coaching,

and buses before the first gymnastics competition can be scheduled on Nov. 27, 2023. Doc. 19 at 21.

Regarding the sale of the gymnastics equipment, the District has provided nothing in the record which indicates keeping the equipment at its present location imposes a financial burden. If the District ends up winning on the merits, they will still be able to sell the equipment, which was originally purchased at $101,730. Doc. 5 Ex. 4.

The harm the plaintiffs will suffer in denying the preliminary injunction is the same as it is under the first factor of irreparable harm, 1) inability to participate in their sport and 2) potential unequal treatment in violation of Title IX.

The Court finds the potential unequal treatment of plaintiffs in violation of Title IX outweighs the burden of continuing the gymnastics program. The District has been operating the gymnastics program for several years, and a financial burden may not justify gender discrimination in violation of Title IX. Portz II, 401 F. Supp. 3d at 867 (found balance of harm in favor of female student athletes enduring gender discrimination over St. Cloud State University's financial burden in reinstating, and continuing, the women's tennis team and Nordic skiing team).

IV.   Factor Three: Likelihood of Success on the Merits

The Court finds the plaintiffs have a substantial probability of success on the merits as defendants have not shown compliance with any of the three-prongs of Title IX's *effective accommodation* test.

Factor three of Dataphase requires an analysis of the movant's probability of success on the merits. Dataphase, 640 F.2d at 113. This requires an explanation and review of the law under Title IX as it applies to athletics and the Fourteenth Amendment's Equal Protection clause because the plaintiffs are claiming the elimination of the gymnastics program violates both of these.

8

Appellate Case: 23-3401   Page: 10   Date Filed: 12/18/2023   Entry ID: 5345292

A.    Equal Protection

The Court finds the plaintiffs have abandoned their claim under Fourteenth Amendment Equal Protection Clause because plaintiffs have not pleaded any arguments in their briefs or at oral arguments regarding this claim.

Even if plaintiffs had not abandoned the claim, they would fail on the merits as they have not shown the elimination of the gymnastics program was because of their sex. The Fourteenth Amendment's Equal Protection Clause prohibits States from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1.  The 8th Circuit has stated an "equal protection claim will fail nonetheless without a showing of discriminatory intent." Keevan v. Smith, 100 F.3d 644, 651 (8th Cir. 1996) (citing Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 272 (1979), and Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977).  The 8th Circuit continues that stating discriminatory intent "…implies that the decisionmaker…selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id.  Plaintiffs have not pleaded any facts which indicated the gymnastics team was eliminated because it was comprised of females.

B.    Title IX: Athletics Law

The merits of this case are found in Title IX which the Department of Education's (DOE) regulates, interprets, clarifies, and enforces. 20 U.S.C.A §1682; 34 C.F.R 106.1-71; Chalenor v. University of North Dakota, 291 F.3d 1042, 1046-47 (8th Cir. 2002)(8th Circuit held that the DOE regulations, interpretations and clarifications will be given controlling deference, rejecting plaintiff's arguments to the contrary, and citing Supreme Court cases: Christensen v. Harris County, 529 U.S. 576 (2000) and *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)); *Reaffirmed* by 8th Circuit in Portz v. St. Cloud State Univ., 16 F.4th 577, 581 (2021) ("Portz III")).

Initially, the Department of Health, Education, and Welfare (HEW) was granted the mandate of enforcing and interpreting Title IX.  HEW was split in 1979 into the DOE,

9

and Department of Health and Human Services (HHS). U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *HHS Historical Highlights*,https://www.hhs.gov/about/historical-highlights/index.html, (last visited Oct. 11, 2023). From then on, the DOE inherited the role of enforcing and interpreting Title IX. Id. Within the DOE, the Office for Civil Rights (OCR) is charged with regulating, enforcing, interpreting, and clarifying Title IX. THE OFFICE FOR CIVIL RIGHTS, *OCR's Case Processing Manual (CPM)*, THE U.S. DEPT. OF EDUCATION, https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf (effective July 18, 2022) ("The Case Processing Manual (CPM) provides OCR with the procedures to *promptly and effectively investigate and resolve complaints[1]*, compliance reviews and directed investigations to ensure compliance with the civil rights laws [including but not limited to Title IX] enforced by OCR.").

While Title IX initially did not directly apply to athletics programs and only applied to "program[s] or activity," though 20 U.S.C.A §1687, the DOE in 34 C.F.R §106.41 applied Title IX directly to athletic programs that receive federal funding. 20 U.S.C.A §1687; 34 C.F.R 106.41; Chalenor, 291 F.3d at 1046-47 (8th Circuit holds controlling deference should be given to DOE regulations and interpretations); *Reaffirmed* in Portz III, 16 F.4th at 581. 34 C.R.F. §106.41(c) requires that recipients of federal funding, "which operates or sponsors…athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R §106.41(c). The Supreme Court has held that recipients of federal funds under Title IX claims are the institutions and programs that receive federal funds and not the officials or individuals involved. Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009); Kinman v. Omaha Public Sch. Dist., 171 F.3d 607, 611 (8th Cir. 1999). 34 C.R.F. §106.41 provides 10 factors, "the Laundry List," to consider when determining if a recipient of federal funding has provided equal opportunity to members of both sexes,

---

[1] Which the OCR seems to have failed to do in this case, thus forcing plaintiffs to bring this matter to the Courts.

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

34 C.F.R §106.41(c).

In applying the 10 factors, the DOE issued interpretation 44 Fed. Reg. 71413. *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71413-71423(1979). The purpose of the interpretation was to provide "guidance on the requirements for compliance with Title IX…" Id. at 71413. The DOE separates the 10 factors into two parts for analysis, *effective accommodation* which encapsulates factor one, and *equal opportunity* which encapsules factors two through 10. Id. at 71415-71478. The pleadings have focused entirely on the claim of *effective accommodation* and is the focus of this analysis.

a. Effective Accommodation

The DOE set forth a three-pronged test to determine an institution's current compliance with *effective accommodation* of members of both sexes. The DOE requires institutions (focused toward colleges and universities) to be presently compliant with any one of the three prongs to find the institution compliant under Title IX. Id. The three prongs are,

Appellate Case: 23-3401    Page: 13    Date Filed: 12/18/2023 Entry ID: 5345292

> (1) Whether intercollegiate level participation opportunities for male and
> female students are provided in numbers substantially proportionate to their
> respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented
> among intercollegiate athletes, whether the institution can show a history
> and continuing practice of program expansion which is demonstrably
> responsive to the developing interest and abilities of the members of that
> sex; or
>
> (3) Where the members of one sex are underrepresented among
> intercollegiate athletes, and the institution cannot show a continuing
> practice of program expansion such as that cited above, whether it can be
> demonstrated that the interests and abilities of the members of that sex have
> been fully and effectively accommodated by the present program.

Id. at 71418.

      i.   Prong One

Compliance with prong one begins with determining the "*participation opportunities* afforded to male and female athletes..." and then moves onto determining if the *participation opportunities* are "substantially proportionate" to each gender's respective enrollments.   OCR, U.S. DOE, *Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test* (Jan. 15, 1996)("1996 Clarification") (Must be given controlling deference as held in Chalenor, 291 F.3d at 1046-47).   The DOE has clarified that a *participation opportunity* are athletes:

> a. Who are receiving the institutionally-sponsored support normally provided to
> athletes competing at the institution involved, e.g., coaching, equipment, medical
> and training room services, on a regular basis during a sport's season; and

Appellate Case: 23-3401   Page: 14   Date Filed: 12/18/2023 Entry ID: 5345292

> b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and
>
> c. Who are listed on the eligibility or squad lists maintained for each sport…

44 Fed. Reg. at 71415.  Generally, the DOE tells us that "all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants." 1996 Clarification at 5.  Next, it must be determined if the number of participation opportunities afforded each sex is "substantially proportionate" to each gender's respective enrollments.  Id.  "[T]he athletics program's female-to-male ratio need not be exactly the same as the student-body ration, but it must be close."  Portz I, 196 F.Supp.3d at 975.  While the DOE does not provide a black letter definition, the DOE,

> …will consider substantial proportionality achieved where the number of additional participants necessary for exact proportionality *"would not be sufficient to sustain a viable team."*  A "viable team" is defined as "a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team."

Portz II, 401 F. Supp. 3d at 856-857 (citing 44 Fed. Reg. at 71418) (emphasis added). The DOE provides the examples,

> 1)    Institution A is a university with a total of 600 athletes.  While women make up 52 percent of the university's enrollment, they only represent 47% of its athletes.  If the university provided women with 52 percent of athletic opportunities, approximately 62 additional women would be able to participate.  Because this is a significant number of unaccommodated women, it is likely that a viable sport could be added.  If so, Institution A has not met [prong] one.
>
> 2)    As another example, at Institution B women also make up 52 percent of a university's enrollment and represent 47 percent of Institution B's athletes.  Institution B's athletic program consists of only 60 participants.  If the university provided women with 52 percent of athletic opportunities, approximately 6

13

Appellate Case: 23-3401   Page: 15   Date Filed: 12/18/2023 Entry ID: 5345292

additional women would be able to participate. Since 6 participants are unlikely to support a viable team, Institution B would meet [prong] one.

1996 Clarification at 6.

The Court finds that the District fails to show compliance with prong one. While the District correctly argues that "substantially proportionate" is determined on a case-by-case basis (Portz I, 196 F. Supp. 3d at 975), the District has not shown that the context around their deviation in athletic participation of 7.6% is "substantially proportionate" to their enrollment.

The District pleads that there are more types of female sports offered than male sports offered. However, this is irrelevant as prong one looks at the number of participation opportunities, or athletes involved in athletics, and not the number of sports offered. Doc. 17 at 11; 1996 Clarification at 5-6.

The District fails to meet the guidelines for what the DOE would consider "substantially proportionate." The District pleads that 441 additional female participants are needed to be at exact proportionality. Doc. 17 at 13. As stated, DOE guidelines hold that the DOE will not find an athletic program is "substantially proportionate" under prong one when the number of individuals needed to achieve exact proportionality can sustain a viable team. Portz II, 401 F. Supp. 3d at 856-857 (*citing* 1996 Clarification). The DOE defines a viable team as "a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." Portz II, 401 F. Supp. 3d at 856-857 (citing 44 Fed. Reg. at 71418). The District pleads that, in the 2022-23 school year, the gymnastics program had 57 participants. Doc. 17 at 13. A gymnastics team would reduce by at least 57 athletes the 441-athlete discrepancy in proportionality.

14

Appellate Case: 23-3401   Page: 16   Date Filed: 12/18/2023 Entry ID: 5345292

Finally, the District's 7.6% deviation is not close to meeting "substantially proportionate" as determined by the rulings of other courts in various circuits. To borrow from the good work of the Hon. John R. Tunheim in Portz I,

> While courts have not precisely determined how great the deviation need be before the ratios are no longer "substantially proportionate," they have coalesced on a few guideposts. When the female-to-male ratio in an athletics program deviates from the ratio in the student body by 10 or more percentage points, the two ratios are very rarely substantially proportionate. *See* Pederson v. La. State Univ., 213 F.3d 858, 878–79 (5th Cir.2000) (*20% is unacceptable*); Roberts v. Colo. State Bd. of Agric., 998 F.2d 824, 829–30 (10th Cir.1993) (*10.5% is unacceptable*); Cohen v. Brown Univ., 991 F.2d 888, 892, 903 (1st Cir.1993) (*11.4% is unacceptable*). At the other end of the spectrum*, a deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate*. *See* Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 109–10 (4th Cir.2011) (*less than 3% is acceptable*); Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 611, 615–16 (6th Cir.2002) (*less than 2% is acceptable*);Boulahanis v. Bd. of Regents, 198 F.3d 633, 636, 638–39 (7th Cir.1999) (*less than 3.43% is acceptable*). In between, things are less clear. *Compare* Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843, 856–57 (9th Cir.2014) (*6.7% deviation is unacceptable*), and Biediger, 691 F.3d at 105–08 (3.62% deviation is unacceptable), *with* Neal v. Bd. of Trs. of Cal. State Univs., 198 F.3d 763, 765 (9th Cir.1999) (*discussing a case where the court permitted the entry of a consent decree where the university agreed to keep the deviation below 5%*).

Portz I, 196 F.Supp.3d at 975 (emphasis added).

15

While the determination of "substantially proportionate" is on a case-by-case basis, none of the case law quoted above supports a finding that a 7.6% deviation is "substantially proportionate." This suggests that the District is unlikely to be able to show compliance under prong one. The only justification the District has provided for the 7.6% deviation is arguing that the deviation speaks for itself and is the result of the "existing male student body's desire to participate in certain sports at extremely higher numbers." Doc. 17 at 14. The District did not provide any support showing that the interest rate in sports is higher in males than females, thus reflecting the 7.6% deviation. This argument relies on the stereotype of males being more interested in sports, which Title IX guidance specifically eschews.

The District has not shown why, in their case, a 7.6% deviation is "substantially proportionate" to their enrollment numbers. Thus, Plaintiffs have shown they possess at least a fair chance of succeeding on their Title IX claim.

### ii. Prong Two

Compliance with prong two requires the institution to show expansion of athletic opportunities to the underrepresented sex both 1) historically and 2) continuously (*at present*) over the "entire history of the [intstitution's] athletic program, focusing on the *participation opportunities* provided to the underrepresented sex," in response to their interests and abilities. 1996 Clarification at 7. The DOE's focus on participation opportunities means that program expansion will not look at the addition of teams, but the addition of participation opportunities for athletes those teams provide. Id.

For an institution to show a history of program expansion the DOE will look at,

> (1) an institution's record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex;

Appellate Case: 23-3401     Page: 18     Date Filed: 12/18/2023 Entry ID: 5345292

> (2) an institution's record of increasing the numbers of participants in intercollegiate athletics who are members of the underrepresented sex; and
>
> (3) an institution's affirmative responses to requests by students or others for addition or elevation of sports.

1996 Clarification at 7.  For an institution to show a continuing practice of expansion the DOE will look at, among others,

> (1) an institution's current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and
>
> (2) an institution's current implementation of a plan of program expansion that is responsive to developing interests and abilities.
>
> (3) an institution's effort to monitor developing interests and abilities of the underrepresented sex, for example, by conducting periodic nondiscriminatory assessments of developing interests and abilities and taking timely actions in response to the results.

Id.  When an institution eliminates a team for the underrepresented sex, the DOE will put the elimination within the analysis of the intuitions continuing practice of expansion.  Id.

The Court finds the District cannot show a continuing (present) practice of expansion responsive to the interests and ability of the underrepresented sex because they eliminated a team counter to the interests of the underrepresented sex.

While the District has shown a history of expanding participation opportunities for females, the District has not shown to a substantial degree that they are continuously (presently) expanding participation opportunities for females in line with female students'

Appellate Case: 23-3401     Page: 19     Date Filed: 12/18/2023 Entry ID: 5345292

interests and abilities. Per DOE guidelines, the recent elimination of a team for the underrepresented sex shall be reviewed when considering the District's continuing practice of expansion. 1996 Clarification at 7.

The District can show a history of expanding participation opportunities for females. The District has shown that the discrepancy between male and female athletes has trended downward since 2004 as the number of participation opportunities for females has increased over the years. Doc. 18 Ex. A. Since 2008, the District has added five female sports: competitive cheer, competitive dance, soccer, wrestling, and softball. Doc. 17 at 4. The expansion of female sports, and the decrease in the discrepancy between male and female athletes shows a history of expanding participation opportunities for females.

The District has not shown to a substantial degree that they are continuously (presently) expanding participation opportunities for females in line with female students' interests and abilities, as required under prong two. The District argues that the gymnastics team is not viable due to a lack of participation. Doc. 17 at 1. The District argues that there is not enough interest to sustain the gymnastics program, citing a decrease in the program's participation from 133 females in the 2015-16 school year[2] to 57 females in the 2022-23 school year, and difficulty in hiring coaches. Doc. 18 at 4. The District also stated in oral arguments, that they have increased the overall number of participation opportunities for females by adding girls wrestling and softball in response to interest in those sports by female students in 2021, and 2022 respectively. Doc. 18 Ex. A.

Plaintiffs, however; have countered with strong evidence of interest and ability for a gymnastics program as evidenced by 1) this case, 2) the affidavits of gymnastics

---

[2] 2015-16 school year is also the year the school district had its lowest deviation rate in female enrollment to female athletic participation at 4.7%. Doc. 18 Ex. A.

Date Filed: 12/18/2023 Entry ID: 5345292   Page: 20   Appellate Case: 23-3401

coaches stating they are willing to coach, and 3) a 2021 High School Survey ("the Survey") recording students' interests in sports. Doc. 24 Ex. 2. The survey recorded 113 responses interested in or participating in gymnastics, 44 responses interested in or participating in girls wrestling, 107 responses and 87 responses interested in Fall and Spring softball respectively. Doc. 24 Ex. 2 at 4. With this, the Court finds plaintiffs have presented enough to show a strong interest in gymnastics, and that the District acted counter to the interests of students when they eliminated the gymnastics program. Further, while the addition of girls wrestling, and softball has increased the number of participation opportunities for females, the elimination of the gymnastics program will reduce the overall number of participation opportunities for females by 57. Doc. 17 at 13. The goal of prong two is to expand participation opportunities within athletic programs for females; not allow for a two-steps-up, one-step-back approach to gender equality. Thus, the decrease in participation opportunities for females goes against finding the District is continuously (presently) expanding opportunities for females.

The pleadings show there is serious doubt whether the District is compliant with prong two. Thus, plaintiffs have a fair chance of succeeding on the merits.

### iii.  Prong Three

Compliance with prong three focuses on the institution's ability to accommodate the athletic "interests and abilities of the underrepresented sex." *Letter from Russlynn Ali, Assistant Sec'y for Civil Rights*, OCR, U.S. DOE, *to Colleagues*, at 4 (Apr. 20, 2010) ("2010 Letter"). The purpose of the third prong is to allow institutions with a disproportional number of participation opportunities to comply with Title IX by showing the underrepresented sex is not being denied opportunities, and the disproportionality, in other words, is caused by a lack of interest and ability on the part of the underrepresented sex. 2010 Letter at 3. Thus, the underrepresented sex's interests and abilities are being fully and effectively accommodated. 1996 Clarification at 8.

19

The DOE will consider three factors in determining if the institution has accommodated the interests and abilities of the underrepresented sex. 2010 Letter at 3, 1996 Clarification at 8.

> (1) whether there is unmet interest in a particular sport;
>
> (2) whether there is sufficient ability to sustain a team in the sport, and;
>
> (3) whether there is a reasonable expectation of competition for the team?

2010 Letter at 3, 1996 Clarification at 8. "*If an institution has recently eliminated a viable team from the intercollegiate program*, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport and *thus there would be a presumption that the institution is not in compliance with [prong three]*." 2010 Letter at 5 (emphasis added).

The Court finds the District has not shown compliance with prong three because they have not pleaded any arguments regarding such. Since the District has not pleaded any arguments relating to prong three, the District has not overcome the presumption that they are not in compliance with prong three.

a.   Conclusion on Likelihood of Success on the Merits

The Court finds, based on the provided pleadings and oral arguments of the parties; the plaintiffs have a substantial probability of success on the merits because the District has not shown compliance with any of the three-prong tests of Title IX. The District fails prong-one because they have not shown the discrepancy between female athletic participation and enrollment is "substantially proportional." The District fails prong-two because they have not shown they are continuously (presently) expanding participation opportunities for females. The District fails prong-three because they are silent on the

matter. The District has failed to show compliance with any of the three prongs. The plaintiffs have a good chance of succeeding on the merits.

## V. The Public Interest.

The Court finds the fourth factor favors the plaintiff's because it is "firmly in the public's interest to enforce antidiscrimination laws such as Title IX." Portz II, 401 F.Supp.3d at 869. I do find the District's argument that it is in the public interest to allow the District discretion in administering its own finances compelling. I am always hesitant to overturn the decision of an elected body as an unelected official appointed to the bench by President Bill Clinton in 1995. However, financial concerns cannot outweigh the harm of gender discrimination, particularly when compliance means continuing a over one-decade long gymnastics program. Further, finances are generally not a factor the Court may consider under Title IX. Ohlensehlen v. Univ. of Iowa, 509 F. Supp. 3d 1085 (S.D. Iowa 2020) (citing a 6th Circuit case and a district court case from the 7th Circuit). The goal of Title IX is to eliminate gender discrimination with the resources available. The District's argument that they only have enough funding to provide potentially discriminatory opportunities is a direct violation of Title IX.

I was initially bothered by the delay in seeking relief from the Court. I learned, however, that plaintiffs attempted to proceed administratively and received no answer. Parties should, as far as possible, proceed to seek an administrative remedy before rushing to court and plaintiff have done that.

### CONCLUSION

The Court finds that, on balance, the Dataphase factors favor granting plaintiffs' request for a preliminary injunction reinstating the gymnastics program and preventing the sale of the program's equipment. The first factor weighs in favor of plaintiffs because they have shown they will suffer the irreparable harm of not participating in gymnastics and possibly suffering a Title IX violation. Plaintiffs have shown that the second factor leans in their favor because they possibly face unequal treatment in violation of Title IX,

Appellate Case: 23-3401     Page: 23     Date Filed: 12/18/2023 Entry ID: 5345292

and the administrative burden in continuing to operate the gymnastics program is minimal. The third factor favors the plaintiffs because they have a substantial probability of success on the merits as defendants have not shown compliance with any of the three-prongs of Title IX's *effective accommodation* test. Finally, the fourth factor weighs in favor of plaintiffs because it is within the public's interest to enforce antidiscrimination laws such as Title IX.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Dr. Jane Stavem and Casey Meile are DISMISSED because plaintiffs have abandoned their equal protection claim and Title IX cannot be brought against individual officials.

2. Plaintiffs' Motion for a Temporary Restraining Order is DENIED as moot.

3. Plaintiffs' Motion for a Preliminary Injunction is GRANTED as follows:

   Until further order of the Court, the Sioux Falls School District is PRELIMINARILY ENJOINED from:

   a. Eliminating the Sioux Falls School District's gymnastics program;

   b. Selling the gymnastics program's equipment;

   c. Reducing support for the gymnastics program below the prior 2022-2023 budget, and;

   d. Restricting or denying the gymnastics program access to facilities, coaching, training, or competitive opportunities.

4. Plaintiffs' request for attorney's fees incurred is DENIED.

DATED this 13th day of October, 2023.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

22

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| S.A. AND L.A., BY THEIR NEXT FRIEND ANGI ALLEN; H.B., BY HER NEXT FRIEND JULIE BEANER; Ad.S. AND Al.S., BY THEIR NEXT FRIENDS BRYAN SCHAVE AND BRANDI SCHAVE; S.D., BY HER NEXT FRIENDS JENNIFER DEGROOT AND PHILIP DEGROOT; A.L., BY HER NEXT FRIEND NATHAN LEUNING; M.B., BY HER NEXT FRIEND JOSEPH BILDERBACK; M.D., BY HER NEXT FRIEND DAVID DENSON; M.W., BY HER NEXT FRIENDS EUGENE WARE AND MARSHA WARE; KA, BY HER NEXT FRIEND CATHY ANDERSON, and R.T., BY HER NEXT FRIENDS LUKE AND BOBBIE TIBBETTS, | Case No. 4:23-cv-04139 |
| Plaintiffs, | |
| vs. | **AFFIDAVIT OF** **JANE STAVEM, Ed.D.** |
| SIOUX FALLS SCHOOL DISTRICT 49-5, JANE STAVEM, in her official capacity as Superintendent, and CASEY MEILE, in his official capacity as Coordinator of Athletics for the Sioux Falls School District No. 49-5, | |
| Defendants. | |

STATE OF SOUTH DAKOTA )
                : SS
COUNTY OF MINNEHAHA )

Jane Stavem, Ed.D., being duly sworn on oath, states and alleges as follows:

1.     I am the Superintendent of the Sioux Falls School District. I submit this Affidavit

in opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction

1

Appellate Case: 23-3401    Page: 25    Date Filed: 12/18/2023    Entry ID: 5345292

in the above-entitled matter. My statements in this Affidavit are based upon my personal
knowledge.

2.　　I joined the Sioux Falls School District in 2020 when I was hired by the School
Board to be Superintendent. Prior to joining the Sioux Falls School District, I worked in
education in a variety of capacities for approximately three decades. My prior service included
working in other school districts as a classroom teacher, building principal, a Director of
Curriculum and Instruction, an Assistant Superintendent, and Superintendent.

3.　　My educational background is as follows:

- 2008 - Doctor of Education, Educational Administration, University of Nebraska, Lincoln, NE
- 2007 - Education Specialist, Educational Administration, University of Nebraska, Lincoln, NE
- 2001 - Educational Administration Licensure Degree, St. Mary's University, Minneapolis, MN
- 1993 - Master of Education, Educational Leadership, Bethel University, St. Paul, MN
- 1989 - Bachelor of Arts, Elementary Education, Bethel University, St. Paul, MN

4.　　In my role as Superintendent of the Sioux Falls School District, I serve as the
professional advisor to whom the School Board delegates executive responsibility. It is the
primary responsibility of the School Board to formalize the educational ideals, values, and goals
of the community into concepts of policy. It is my responsibility to see that the School Board's
policies are translated into actual practice.

5.　　The office of the Superintendent is the Chief Executive Office of the School
District, providing overall leadership for the school system. In my role as Superintendent, my
staff and I maintain a strong curriculum for the K-12 program and early childhood, provide
special programs for children of diverse backgrounds and abilities, and support services such as
transportation, libraries, and counselors. In addition, I manage 23 elementary schools, six middle

2

schools, four high schools, an alternative school, a career technical education academy, and other related buildings. My staff and I also prepare the annual budget, oversee the fiscal management of the Sioux Falls School District, and are responsible for making program and policy recommendations and Board policies.

6.      In the Sioux Falls School District, we are aware of our legal obligations under Title IX of the Education Amendments of 1972. The District has worked very hard to provide diverse opportunities for female and male student athletes.

7.      Attached hereto as Exhibit A is a spreadsheet documenting the number of female and male student athletes participating in high school sporting activities in the Sioux Falls School District since 2004. The numbers documented in Exhibit A show the significant expansion of opportunities for female student athletes participating in sports. Notably, in 2004-2005, only 641 female student athletes participated in high school sports. Likewise, in 2005-2006 only 661 female student athletes participated in high school sports. By and large, this number has significantly grown over the years due to efforts by the School District to provide opportunities for female student athletes. In 2022-2023, 1,229 female student athletes participated in high school sports. This is almost twice the number of female student athletes participating in sports in 2004. If sideline cheer is included, 1386 female student athletes participated in high school sports.

8.      Attached hereto as Exhibit B is a chart documenting participation numbers of male and female student athletes in various high school sports from the 2011-2012 school year through the 2022-2023 school year. Exhibit B demonstrates that 2,971 student athletes participated in various high school sports during the 2022-2023 school year. The breakdown by gender of these athletes is 1,742 males and 1,229 females.

3

025

9.      Since 2008, the School District has added the following sports for female high school students:

- Competitive Cheer (fall 2008)
- Competitive Dance (fall 2008)
- Soccer (fall 2014)
- Wrestling (winter 2021-2022)
- Softball (spring 2023)

For female middle school students, the School District has added the following sports:

- Dance (fall 2022)
- Wrestling (winter 2022-2023)
- Soccer (spring 2023)

10.     For the 2023-2024 school year, it is expected that female student athletes will participate in cross country, volleyball, tennis, soccer, competitive dance, competitive cheer, basketball, wrestling, track, golf, and softball.

11.     During my tenure as Superintendent, the gymnastics program for female student athletes was not viable. As demonstrated in Exhibit B, in the 2015-2016 school year 133 female student athletes participated in high school gymnastics. In 2022-2023 school year, participation in gymnastics had fallen to 57 female student athletes in grades 7 through 12.

12.     During the State Team Competition at the gymnastics state meet in February of 2023, Washington High School and Jefferson High School did not qualify for the team competition. Both of these high schools were unable to qualify for the team competition because of a lack of female athletes on their respective teams. The District is tasked with providing equal opportunities to all 4 of its area high schools and does not look favorably on offering only selective sports at 1 or 2 high schools.

13.     It has been a consistent challenge to hire qualified coaches for the gymnastics program. In my first year as Superintendent, the two open head coaching positions had one

4

Appellate Case: 23-3401     Page: 28     Date Filed: 12/18/2023 Entry ID: 5345292

applicant and it was a current assistant coach at another school.  During the 2022-2023 school year, only two of four head coaching positions for high school were filled by the School District. Washington High School has not had a head gymnastics coach for the 2020-2021, 2021-2022, and 2022-2023 school years.  Likewise, Jefferson High School did not have a head gymnastics coach for the 2022-2023 school year.  Job openings were posted for these positions, but no qualifying candidates applied.  The District has also been unable to fill assistant coaching positions to its desired capacity level due to the lack of interest from qualified candidates.  The lack of coaches has made the gymnastics program unviable.  Moreover, the lack of coaches causes a concern about the ability to appropriately monitor student athletes for both their performance and safety.

14.      As noted in Exhibit B, 57 female student athletes in grades 7 through 12 participated in the high school gymnastics program for the 2022-2023 season.  Out of this number, 10 seniors graduated.  In addition, only five 7th graders and five 8th graders participated in gymnastics during the 2022-2023 school year.  This small number of female middle school athletes evidences the viability of continuing a high school program.  By way of comparison, 39 7th and 8th grade female middle school athletes participated in the inaugural middle school wrestling season.

15.      One of the reasons for declining participation in gymnastics is due to the rise of private gymnastic "academies" in South Dakota.  Instead of participating in gymnastics through the public school system, the Sioux Falls School District has become aware that female student athletes are increasingly participating in gymnastics through private academies.  This has caused a steady reduction in the enrollment of female student athletes in gymnastics through the public school system over time.

Appellate Case: 23-3401     Page: 29     Date Filed: 12/18/2023 Entry ID: 5345292

16.     In 2023, the School District's Athletics Budget Committee reviewed, evaluated, and proposed an athletic budget that supported the elimination of gymnastics. This proposal was given as part of the normal budgeting process. The elimination of the gymnastics program was recommended by the committee due to lack of participation in gymnastics and the possibility of reallocating the District's resources, including facility space, to other curricular areas and activities.

17.     It is anticipated by the District that the additional opportunities in softball and wrestling will continue to increase overall female participation in sports. Initial signs of the popularity of wrestling and softball for female student athletes have been positive. As reflected in Exhibit B, 96 female athletes participated in high school softball during the 2022-2023 school year. Likewise, 25 female athletes participated in high school wrestling during the 2022-2023 school year. Over 60 female student athletes participated in wrestling during the 2022-2023 school year when middle school and high school numbers are combined, which is already more participants than gymnastics.

18.     The Sioux Falls School District's School Board is comprised of Carly Reiter (female), Marc Murren (male), Nan Baker (female), Dawn Marie Johnson (female), and Kate Serenbetz (female).

19.     A fiscal year 2024 proposed budget was considered by the School Board in April, 2023. A copy of this proposed budget is attached as Exhibit G to the Affidavit of Alex Hagen, which was filed by Plaintiffs in this matter.

20.     On April 24, 2023, the School Board voted unanimously to tentatively adopt the fiscal year 2024 proposed budget, which included eliminating funding for the gymnastics

6

Appellate Case: 23-3401     Page: 30     Date Filed: 12/18/2023     Entry ID: 5345292

program. Following this vote on April 24, 2023, the School District received no notification of any legal attempt citing Title IX to alter the final decision to approve this budget.

21.     On July 10, 2023, the School Board voted to approve the 2024 proposed budget, which eliminated the gymnastics program. On the day of this vote, a public comment session was offered as part of the regular Board agenda. No member of the public, or representative of the Plaintiffs, voiced any opposition to the passage of the budget. After the passage of the final budget on July 10, 2023, the School District's in-house counsel received correspondence from Plaintiffs' counsel on August 24, 2023, about Title IX concerns. This constituted the first notice of concerns regarding Title IX by Plaintiffs since the passage of the tentative budget in April 2023 and the final budget in July 2023. Plaintiffs' counsel then filed this action on September 12, 2023, which was after four subsequent Board meetings.

22.     It is my understanding Plaintiffs' Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction implies that the decision to eliminate gymnastics was somehow made by an "advisory council" that was made up entirely of men. I disagree with this implication. The ultimate decision to eliminate gymnastics from the 2023-2024 budget was made by the School Board, which is comprised of four women and one man. The decision to eliminate the gymnastics program from the budget was an informed decision based upon a number of factors, including the declining participation in the gymnastics program, the difficulty in hiring and retaining an adequate number of coaches to ensure athlete safety, the amount of money required to continue funding the program in light of declining participation, and the belief that resources could be used more effectively in other areas to provide additional opportunities for females to participate in sporting activities. Contrary to the implication made in Plaintiffs'

7

Brief, the decision to eliminate the gymnastics program was not made only by males and was not done for any discriminatory reason.

23.     The timing of the filing of this action, and the relief sought by Plaintiffs, is extremely problematic. The final budget was approved on July 10, 2023, and suit in this matter was not filed until September 12, 2023. The 2023-2024 academic year has already begun. The gymnastics season begins on October 30, 2023. At this time, no coaches are in place for a season, no contest schedule has been prepared, and the high school teams that attended Sioux Falls public school meets in prior seasons have already found other meets to attend.

24.     At the time the District considered the tentative budget in April 2023, and up until the time the new budget was approved on July 10, 2023, the District still employed gymnastics coaches. The District has not employed any gymnastics coaches since the new budget was approved on July 10, 2023, and it would be extremely difficult, if not impossible, to hire coaches now to sustain a gymnastics program for this season. Again, the District has been unable to hire qualified coaches for this program for an extended period of time. If the District was ordered to hire coaches now, this would be extremely difficult, and virtually impossible.

25.     Moreover, I am concerned that some of the items of gymnastics equipment on hand are no longer usable for another gymnastics season. New equipment has not been ordered and will presumably take several weeks or months to arrive. It is also my understanding that it will cost the District an additional $260,000 to $300,000 for new equipment needed if the gymnastics program would be revived at this late date.

26.     At this time, no bussing has been established for teams to compete in other events outside Sioux Falls. The availability of active bus drivers is currently significantly restricted.

27.     Because no coaches have been retained for any upcoming season, the students that would be interested in gymnastics have not had any off-season workouts to maintain progress in the sport.  In addition, high schools have begun utilizing the practice spaces previously used by gymnastics for other activities, including yoga, competitive cheer, competitive dance, weight training, and other activities.

28.     It is my opinion that it is simply too late now to begin the process of preparing for a gymnastics season.  To complicate matters further, the budget has been set since July 10, 2023, and the addition of any new athletic program would require the reduction in services to other areas already supported by the budget.

29.     The lack of viability for the gymnastics program in Sioux Falls is not unique to South Dakota.  As I understand it, only nine of the largest 19 schools that qualify for the largest class in basketball and volleyball offer gymnastics for students.  Seven of these nine schools do so through the use of off-site practice locations at a club or academy.  Moreover, only 24 South Dakota high schools out of 180 offer gymnastics.  South Dakota's second largest city, Rapid City, is also not offering gymnastics in its public school system for this school year.  It is my understanding the Rapid City School District was having difficulty recruiting coaches and that participation was decreasing in its program.  Accordingly, the reduction in participation of gymnastics in the public school system is not only being felt in Sioux Falls, but throughout South Dakota.

30.     In the 2022-2023 school year, the Sioux Falls School District spent $67,981.19 on the gymnastics program.  If the School District would be ordered to have a gymnastics program for this school year I am certain the cost would exceed the $67,981.19 spent last year.  For the 2023-2024 school year, gymnastics was budgeted for $92,090.00.  Reinstating the gymnastics

9

Appellate Case: 23-3401     Page: 33     Date Filed: 12/18/2023 Entry ID: 5345292

program at this time would have a significant financial impact on the District as the budget has already been approved and is being utilized in the current school year. The District would be forced to pull funds from other allocated programs, in order to fund gymnastics.

31.     The Sioux Falls School District must be responsible in its fiscal management of public funds. The School Board made the decision to eliminate the gymnastics program for a variety of reasons, including being fiscally responsible with public money and to serve, in the judgment of the School Board, the public interest. The District made the difficult decision to adjust its athletic programs in a transparent and student-focused fashion. It provided early notice in April 2023, of its decision to eliminate gymnastics, which was months before the District's 2023-2024 budget eliminating the gymnastics program was ultimately approved.

32.     The Sioux Falls School District does not deny any athletic participation because of gender. No individual is told that he or she may not play because they are male or female. Everyone, regardless of sex, has some opportunity to represent the District in competition. No one is excluded from participation because of his or her gender.

33.     The decision made by the School Board to eliminate the gymnastics program was not made lightly. This decision was only made after careful consideration of all of the facts, including the declining enrollment of female student athletes in public school gymnastics. The School District believes the additions of softball and wrestling will increase the number of female student athletes participating in sports. The District, therefore, respectfully requests that the Plaintiffs' motion for a temporary restraining order and preliminary injunction be denied.

Dated this _29th_ day of September, 2023.

Jane Stavem, Ed.D.

10

EXHIBIT
A

## Sioux Falls School District 49-5 Athletic Program

| School Year | Female Enrollment | Male Enrollment | Female # (Cross Country, Volleyball, Tennis, Soccer, Comp Dance, Comp Cheer, Basketball, Wrestling (2021), Gymnastics, Track, Golf, Softball (2022)) | Male # (Football, Cross Country, Golf, Soccer, Basketball, Wrestling, Gymnastics, Track, Softball) | % | Female # (Cross Country, Volleyball, Tennis, Soccer, Comp Dance, Comp Cheer, Basketball, Wrestling (2021), Gymnastics, Track, Golf, Softball (2022), Sideline Cheer) | Male # (Football, Cross Country, Golf, Soccer, Basketball, Wrestling, Gymnastics, Track, Softball) | % |
|---|---|---|---|---|---|---|---|---|
| 2004-05 | 2,179 | 2,142 | 641 | 1034 | 12.2% | 641 | 1034 | 12.2% |
| 2005-06 | 2,926 | 2,804 | 661 | 1132 | 14.2% | 661 | 1132 | 14.2% |
| 2006-07 | 3,077 | 3,064 | 695 | 1144 | 12.3% | 695 | 1144 | 12.3% |
| 2007-08 | 3,086 | 3,142 | 694 | 1151 | 11.9% | 694 | 1151 | 11.9% |
| 2008-09 | 3,123 | 3,253 | 770 | 1185 | 9.6% | 822 | 1185 | 8.0% |
| 2009-10 | 3,220 | 3,215 | 832 | 1232 | 9.7% | 884 | 1232 | 8.3% |
| 2010-11 | 3,319 | 3,326 | 847 | 1156 | 7.7% | 927 | 1156 | 5.4% |
| 2011-12 | 3,372 | 3,383 | 830 | 1377 | 12.3% | 830 | 1377 | 12.3% |
| 2012-13 | 3,242 | 3,375 | 792 | 1303 | 11.2% | 792 | 1303 | 11.2% |
| 2013-14 | 3,194 | 3,373 | 945 | 1432 | 8.9% | 1003 | 1432 | 7.4% |
| 2014-15 | 3,161 | 3,434 | 968 | 1375 | 6.6% | 1038 | 1375 | 4.9% |
| 2015-16 | 3,162 | 3,482 | 1020 | 1357 | 4.7% | 1084 | 1357 | 3.2% |
| 2016-17 | 3,191 | 3,483 | 939 | 1300 | 5.9% | 972 | 1300 | 5.0% |
| 2017-18 | 3,246 | 3,491 | 1005 | 1407 | 6.5% | 1042 | 1407 | 5.6% |
| 2018-19 | 3,312 | 3,504 | 937 | 1283 | 6.4% | 984 | 1283 | 5.2% |
| 2019-20 | 3,345 | 3,534 | 714 | 943 | 5.5% | 782 | 943 | 3.3% |
| 2020-21 | 3,483 | 3,606 | 1000 | 1335 | 6.3% | 1038 | 1335 | 5.4% |
| 2021-22 | 3,521 | 3,708 | 1214 | 1629 | 6.0% | 1377 | 1629 | 2.9% |
| 2022-23 | 3,606 | 3,761 | 1229 | 1742 | 7.6% | 1386 | 1742 | 4.6% |
| 2023-24 | | | | | | | | |

Figures A1 and A2 demonstrate the sustained success of the Sioux Falls School District in narrowing the proportionality gap for female student athletes in the District while continuing to grow girls participation numbers to all time highs (see Figure A3).



Exhibit A - Page 1 of 1

Appellate Case: 23-3401     Page: 35     Date Filed: 12/18/2023 Entry ID: 5345292



**2022-23 Participation Numbers**

|  | Male | Female |
|---|---|---|
| Cross Country | 102 | 40 |
| Golf | 119 | 69 |
| Soccer | 158 | 161 |
| Tennis | 90 | 71 |
| Track & Field | 479 | 264 |
| Basketball | 232 | 139 |
| Wrestling | 106 | 25 |
| Football | 454 | 1 |
| Softball | 0 | 96 |
| Volleyball | 0 | 167 |
| Competitive Cheer | 1 | 80 |
| Competitive Dance | 1 | 59 |
| Gymnastics |  | 57 |
| Total: | 1742 | 1229 |

**Total Athletes**

2971

Date Filed: 12/18/2023 Entry ID: 5345292     Page: 36     Appellate Case: 23-3401