# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

### No. 23-3401

---

S.A., NEXT FRIEND ANGI ALLEN; L.A., NEXT FRIEND ANGI ALLEN;
H.B., NEXT FRIEND JULIE BEANER; AD.S., NEXT FRIEND BRYAN SCHAVE AND
BRANDI SCHAVE; AL.S., NEXT FRIEND BRYAN SCHAVE AND BRANDI SCHAVE;
S.D., NEXT FRIEND JENNIFER DEGROOT AND PHILIP DEGROOT;
A.L., NEXT FRIEND NATHAN LEUNING; M.B., NEXT FRIEND JOSEPH
BILDERBACK; M.D., NEXT FRIEND DAVID DENSON; M.W., NEXT FRIEND
EUGENE WARE AND MARSHA WARE; KA, NEXT FRIEND CATHY ANDERSON;
R.T., NEXT FRIEND LUKE TIBBETTS AND BOBBIE TIBBETTS,

Plaintiffs – Appellees,

vs.

SIOUX FALLS SCHOOL DISTRICT 49-5,

Defendant – Appellant,

JANE STAVEM, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT;
CASEY MEILE, IN HIS OFFICIAL CAPACITY AS COORDINATOR OF ATHLETICS
FOR THE SIOUX FALLS SCHOOL DISTRICT NO. 49-5,

Defendants.

---

APPEAL FROM THE U.S. DISTRICT COURT FOR THE DISTRICT OF
SOUTH DAKOTA – SOUTHERN DIVISION
(4:23-cv-04139-CBK)

---

# APPELLANT'S BRIEF

---

Reece M. Almond
DAVENPORT EVANS HURWITZ & SMITH LLP
206 West 14th Street
PO Box 1030
Sioux Falls, SD 57101-1030
Telephone: (605) 336-2880
*Attorneys for Defendant-Appellant*

Claire E. Wilka
CADWELL SANFORD DEIBERT & GARRY LLP
200 East 10th Street, Suite 200
Sioux Falls, SD 57104
Telephone: (605) 336-0828
*Attorneys for Plaintiffs-Appellees*

Appellate Case: 23-3401     Page: 1     Date Filed: 12/18/2023 Entry ID: 5345299

## SUMMARY AND REQUEST FOR ORAL ARGUMENT

After years of dwindling participation numbers in its gymnastics program and after adding two other female sports offerings, namely softball and wrestling, Appellant Sioux Falls School District 49-5 ("District") decided to eliminate its gymnastics program. In response, Plaintiffs, who are students enrolled in the District claiming an interest in participating in gymnastics, commenced this action alleging the District is in violation of Title IX.

The district court granted preliminary injunctive relief after erroneously finding the District is not compliant with Title IX's effective accommodation requirement and ordered the District to reinstate its gymnastics program. And the district court did so without requiring security from Plaintiffs.

The fundamental question the District raises in this appeal: When can a public school district decide to replace a female sport with declining participation and dwindling interest with other sports with greater interest and participation?

Oral argument should be heard because this case is of significant import to public school districts managing athletic opportunities under the pressure of limited resources. The District respectfully requests a fifteen (15) minute oral argument on this matter.

i

## CORPORATE DISCLOSURE STATEMENT

Appellant Sioux Falls School District 49-5 is a public school district, and thus, Rule 26.1 is not applicable to it.

Appellate Case: 23-3401   Page: 3   Date Filed: 12/18/2023 Entry ID: 5345299

# TABLE OF CONTENTS

SUMMARY AND REQUEST FOR ORAL ARGUMENT ............................... i

CORPORATE DISCLOSURE STATEMENT .................................... ii

TABLE OF CONTENTS ................................................... iii

TABLE OF AUTHORITIES ............................................... v

JURISDICTIONAL STATEMENT ............................................ 1

STATEMENT OF THE ISSUES ............................................ 2

    I.   Whether a public school district that recently added two female
        sports with greater participation numbers than a female sport
        with dwindling participation numbers may eliminate the sport
        with dwindling participation numbers and remain compliant with
        Title IX's effective accommodation requirement ..................... 2

    II.  Whether the district court erred in not requiring security from
        Plaintiffs when it issued a preliminary injunction against the
        District ............................................................. 2

STATEMENT OF THE CASE AND FACTS ................................... 3

SUMMARY OF ARGUMENT ............................................... 8

ARGUMENT .......................................................... 9

    I.   The District Court Erred in Finding the District Was Not
        Compliant with Title IX's Effective Accommodation
        Requirement and then Enjoining the District from Eliminating
        Its Gymnastics Program ............................................. 10

        A.  Title IX's Effective Accommodation Requirement .............. 10

Appellate Case: 23-3401    Page: 4    Date Filed: 12/18/2023    Entry ID: 5345299

    B.   The District Satisfies Prong One of the Three-Part Test
          Because It Offers Equal Athletic Participation Opportunities
          to Its Female Students...............................................16

    C.   The District also Satisfies Prong Two of the Three-Part
          Test Because It Has a History and Continuing Practice of
          Expanding Opportunities for Its Female Students...............26

II.  The District Court Erred by Not Requiring Security from
     Plaintiffs When It Issued a Preliminary Injunction against
     the District...........................................................33

CONCLUSION ................................................................. 35

CERTIFICATE OF COMPLIANCE ............................................. 36

CERTIFICATE OF SERVICE ................................................... 37

Appellate Case: 23-3401    Page: 5    Date Filed: 12/18/2023 Entry ID: 5345299

# TABLE OF AUTHORITIES

## Cases

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ............................................................... 21

*Barnes v. Spearfish Sch. Dist. No. 40-2*,
2006 S.D. 108, 725 N.W.2d 226 ........................................................... 29

*Berndsen v. N. Dakota Univ. Sys.*,
7 F.4th 782 (8th Cir. 2021) .............................................................. 2, 15

*Biediger v. Quinnipiac Univ.*,
691 F.3d 85 (2d Cir. 2012) .................................................................. 23

*Cohen v. Brown Univ.*,
991 F.2d 888 (1st Cir. 1993) ........................................................... 11, 30

*Equity In Athletics v. U.S. Dep't of Educ.*,
639 F.3d 91 (4th Cir. 2011) ........................................................... 23, 29

*Glenwood Bridge, Inc. v. City of Minneapolis*,
940 F.2d 367 (8th Cir. 1991) ................................................................ 34

*Hill v. Xyquad, Inc.*,
939 F.2d 627 (8th Cir. 1991) ............................................................ 2, 33

*In re NCAA I-A Walk-On Football Players Litig.*,
2007 WL 951504, (W.D. Wash. Mar. 26, 2007) .......................................... 21

*Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*,
953 F.3d 1041 (8th Cir. 2020) ......................................................... 25, 32

*Mansourian v. Regents of Univ. of California*,
602 F.3d 957 (9th Cir. 2010) ........................................................... 15, 30

*Ng v. Bd. of Regents of Univ. of Minnesota*,
64 F.4th 992 (8th Cir. 2023) ................................................................. 9

Appellate Case: 23-3401    Page: 6    Date Filed: 12/18/2023 Entry ID: 5345299

*Ohlensehlen v. Univ. of Iowa*,
    509 F. Supp. 3d 1085 (S.D. Iowa 2020)....................................2, 34

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014)...........................................22, 25, 27

*Portz v. St. Cloud State Univ.*,
    16 F.4th 577 (8th Cir. 2021)...............................2, 12, 13, 15, 16, 26

*Rathmann Group v. Tanenbaum*,
    889 F.2d 787 (8th Cir. 1989).........................................................33

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
    826 F.3d 1030 (8th Cir. 2016)......................................................34

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944))....................................................................16

*Watkins Inc. v. Lewis*,
    346 F.3d 841 (8th Cir. 2003)........................................................24

## Statutes

20 U.S.C. § 1092 ...........................................................................15

20 U.S.C. § 1681 - Title IX............................................2, 10, 11, 19

SDCL § 13-67-1 .......................................................................4, 17

## Other Authorities

44 Fed. Reg. 71413-71423 (1979) ("1979 Interpretation")12, 13, 14, 15, 20, 21, 22, 23, 25, 28

Education Amendment of 1974, Pub. L. No. 93-380 (HR 69), 88 Stat. 484
    (Aug. 21, 1974) ...........................................................................12

Felice M. Duffy, Twenty-Seven Years Post Title IX: Why Gender Equity in College Athletics Does Not Exist, 19 QLR 67 (2000)..................................21

U.S. Dep't of Educ., Off. for C.R., Clarification of Intercollegiate
   Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996)
   ("1996 Clarification") .................14, 15, 19, 20, 21, 22, 23, 25, 27, 28, 29, 30

**Rules**

Fed. R. Civ. P. 65(c)...................................................................................... 2, 33

**Regulations**

34 C.F.R. § 106.41 ................................................................................ 2, 11, 19

Appellate Case: 23-3401    Date Filed: 12/18/2023 Entry ID: 5345299    Page: 8

## JURISDICTIONAL STATEMENT

On October 13, 2023, the district court entered its Memorandum Opinion and Order Granting Preliminary Injunction which enjoined the District from (a) eliminating the District's gymnastics program; (b) selling the gymnastics program's equipment; (c) reducing support for the gymnastics program below the prior 2022-2023 budget; and (d) restricting or denying the gymnastics program access to facilities, coaching, training, or competitive opportunities, all without requiring security from Plaintiffs. Under 28 U.S.C. § 1331, the district court had jurisdiction over Plaintiffs' allegations claiming the District, a public school district that receives federal funds, is in violation of Title IX of the Education Amendments Act of 1972.

On October 27, 2023, the District noticed this appeal. Under 28 U.S.C. § 1292(a)(1), this Court has jurisdiction over the district court's granting of injunctive relief.

Appellate Case: 23-3401　Page: 9　Date Filed: 12/18/2023 Entry ID: 5345299

# STATEMENT OF THE ISSUES

**I.    Whether a public school district that recently added two female sports with greater participation numbers than a female sport with dwindling participation numbers may eliminate the sport with dwindling participation numbers and remain compliant with Title IX's effective accommodation requirement.**

Most Apposite Cases and Statutory Provisions:

20 U.S.C. § 1681

34 C.F.R. § 106.41(c)

*Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782 (8th Cir. 2021)

*Portz v. St. Cloud State Univ.*, 16 F.4th 577 (8th Cir. 2021)

**II.   Whether the district court erred in not requiring security from Plaintiffs when it issued a preliminary injunction against the District.**

Most Apposite Cases and Statutory Provisions:

Fed. R. Civ. P. 65(c)

*Hill v. Xyquad, Inc.*, 939 F.2d 627 (8th Cir. 1991)

*Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085 (S.D. Iowa 2020)

## STATEMENT OF THE CASE AND FACTS

The District is a public school district in Sioux Falls, South Dakota, comprised of twenty-three elementary schools, six middle schools, four high schools, an alternative school, and a career technical education academy. (App. 278-79; R. Doc. 18 at 2-3.) The District's elected school board is comprised of four females and one male, and its superintendent is female. (App. 282; R. Doc. 18 at 6.)

As a public school district receiving federal funds, the District is aware of its legal obligations under Title IX of the Education Amendments Act of 1972 and has worked hard to provide diverse athletic opportunities for its female students. (App. 279; R. Doc. 18 at 3.) The District's hard work has yielded positive results. In the 2005-06 school year, only 661 female students participated in high-school athletics. (*Id.*) Through the District's efforts—including adding competitive cheer in the fall of 2008, competitive dance in the fall of 2008, soccer in the fall of 2014, wrestling in the winter of 2021, and softball in the spring of 2023—the District increased female athletic participants to 1,229[1] students by the 2022-23 school year. (App. 279-80;

_____

[1] If sideline cheer is included, this number increases to 1,386 participants. (App. 279; R. Doc. 18 at 3.)

3

R. Doc. 18 at 3-4.) This is an 86 percent increase in female athletes over the last seventeen years.[2]

In the 2022-23 school year, the District offered thirteen sports to its female students: cross country, golf, soccer, tennis, track & field, basketball, wrestling, football (only one female participated), softball, volleyball, competitive cheer, competitive dance, and gymnastics. (App. 288-89; R. Doc. 18 at Ex. A, Ex. B-pg.1.) That same year, the District offered only ten sports to its male students: cross country, golf, soccer, tennis, track & field, basketball, wrestling, football, competitive cheer (only one male participated) and competitive dance (only one male participated). (*Id.*) Female students could participate in any sport while their male counterparts were not permitted to participate in softball, volleyball, or gymnastics.[3] The District's participation numbers for the 2022-23 school year, broken down by sport and sex, were as follows:

_____

[2] Female enrollment increased from 2,926 students in 2005-06 to 3,606 students in 2022-23, which was a 23 percent increase in female enrollment. (App. 288; R. Doc. 18 at Ex. A.) Thus, the increase in female athletic participation significantly outpaced female enrollment over this timeframe.

[3] Under South Dakota law, male students cannot participate in female-designated sports. SDCL § 13-67-1.

4

| 2022-23 Participation Nos. | | |
|---|---|---|
| | Male | Female |
| Cross Country | 102 | 40 |
| Golf | 119 | 69 |
| Soccer | 158 | 161 |
| Tennis | 90 | 71 |
| Track & Field | 479 | 264 |
| Basketball | 232 | 139 |
| Wrestling | 106 | 25 |
| Football | 454 | 1 |
| Softball | 0 | 96 |
| Volleyball | 0 | 167 |
| Competitive Cheer | 1 | 80 |
| Competitive Dance | 1 | 59 |
| Gymnastics | 0 | 57 |
| Total: | 1,742 | 1,229 |

(App. 289; R. Doc. 18 at Ex. B.) Notably, the District's high-school enrollment for the 2022-23 school year totaled 7,367 students, 3,761 of which were male and 3,606 were female. (App. 288; R. Doc. 18 at Ex. A.)

The District's gymnastics program has seen a decrease in interest for several years. Starting with participation numbers, gymnastics participants have decreased from 133 athletes in the 2015-16 school year to only 57 athletes (including ten middle schoolers) in the 2022-23 school year, which was a 57 percent decrease in participants. (App. 280-81; R. Doc. 18 at 4-5.) Due to these small participation numbers, only two of the District's four high schools qualified for the team competition at the 2023 state tournament. (*Id.*) The

District saw this as a problem because the District seeks to provide equal opportunities at all four of its high schools and does not look favorably on offering selective sports at one or two of its high schools. (*Id.*) The decline in participation numbers was not the only sign of decreased interest in the gymnastics program. The District has experienced difficulties hiring qualified coaches for its four high schools. (*Id.*) During the 2022-23 school year, there were only two head coaches for the District's four high schools. One of its high schools, Washington High School, has not had its own[4] head gymnastics coach for several years because no qualified candidates applied for the position. (*Id.*) The District has also been unable to fill assistant coaching positions to its desired capacity level. (*Id.*) The lack of coaches causes concern for the District about the ability to appropriately monitor student athletes for both their performance and safety. (*Id.*)

The lack of interest in high-school gymnastics is not isolated to the District. Only 24 of South Dakota's 180 high schools offer gymnastics; only 9 of the largest 19 schools that qualify for the largest class in basketball and volleyball offer gymnastics. (App. 285; R. Doc. 18 at 9.) The Rapid City

---

[4] The District had a head coach from another school act as head coach for the Washington High School gymnastics team.

Appellate Case: 23-3401    Page: 14    Date Filed: 12/18/2023 Entry ID: 5345299

School District, located in South Dakota's second-largest city, eliminated its gymnastics program for the 2023-24 school year due to lack of coaching and participant interest. (*Id.*)

Furthermore, as with any public school district, the District is always conscious of budget constraints. In the 2022-23 school year, the District spent $67,981.19 on the gymnastics program. (*Id.*) For the 2023-24 school year, the District budgeted $92,090.00 for gymnastics before deciding to eliminate the program. (*Id.*) The District also believes an additional $260,000 to $300,000 in equipment costs is on the horizon. (App. 284; R. Doc. 18 at 8.)

Considering the above issues surrounding the gymnastics program and the fact the District had recently added two other female sports (i.e., softball and wrestling) to its athletic offerings, the District, through its school board, decided to eliminate the gymnastics program starting in the 2023-24 school year. (App. 279-86; R. Doc. 18 at 3-10.) This was not an easy decision, but one the District took comfort in making knowing that it had just added softball, in which 96 female students participated during its inaugural year of 2023, and wrestling, in which 64 female students (counting both high school and middle school students) participated during the 2022-23 school year. (App. 280-82; R. Doc. 18 at 4-6.) In other words, the District replaced 57 gymnastics

7

participants with 160 softball and wrestling participants, resulting in a net gain of 103 female athletic participants.

Plaintiffs, who are students enrolled in the District claiming an interest in participating in gymnastics, commenced this action alleging the District is in violation of Title IX for eliminating its gymnastics program and sought injunctive relief preventing said elimination from occurring. After finding the District is not compliant with Title IX's effective accommodation requirement, the district court granted preliminary injunctive relief and ordered the District to reinstate its gymnastics program. (App. 403-24; R. Doc. 26 at 1-22.) And it did so without requiring security from Plaintiffs. The District seeks reversal of both those decisions.

## **SUMMARY OF ARGUMENT**

The district court erred in finding the District is not compliant with Title IX's effective accommodation requirement. For the 2023-24 school year, the District's female students had more sport offerings to choose from than their male counterparts, had access to all the same sports, and there were no barriers (e.g., lack of scholarships) the females had to overcome to participate in said sports that the males did not. Nevertheless, the district court erroneously

concluded the District offers unequal participation opportunities to its female students.

Furthermore, in the last seventeen years, the District has increased the number of female athletes by 86 percent, going from only 661 female athletes in the 2005-06 school year to 1,229 athletes in the 2022-23 school year. Since 2008, the District has added five new female sports, two of which were added in the last two school years. In just the last five years, the District has increased the number of its female athletes from 937 to 1,229. (App. 288; R. Doc. 18 at Ex. A.) Nonetheless, the district court erroneously concluded the District does not have a continuing practice of expanding opportunities for its female students.

## ARGUMENT

When reviewing a district court's grant of a preliminary injunction, this Court reviews the district court's "material factual findings for clear error, its legal conclusions de novo, and the court's equitable judgment—the ultimate decision to grant the injunction—for an abuse of discretion." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023).

It is the district court's legal conclusions that the District asks this Court to review and reverse. The district court concluded the District had "not shown

9

compliance with any of the three-prongs of Title IX's effective accommodation test." (App. 410; R. Doc. 26 at 8.) The district court also ordered preliminary injunctive relief without requiring security. (App. 424; R. Doc. 26 at 22.) Each of these conclusions was erroneous.

## I. The District Court Erred in Finding the District Was Not Compliant with Title IX's Effective Accommodation Requirement and then Enjoining the District from Eliminating Its Gymnastics Program

In analyzing the likelihood of success factor of the *Dataphase* balancing test, the district court concluded the District failed to show compliance with Title IX's effective accommodation requirement. Because that conclusion resulted from an incorrect application of the law to the undisputed facts, the District asks this Court to reverse and find the District is compliant with Title IX's effective accommodation requirement.

### A. Title IX's Effective Accommodation Requirement

Title IX of the Education Amendments Act of 1972 provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Title IX also provides in relevant part:

10

> Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: Provided, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

20 U.S.C. § 1681(b). "Put another way, a court assessing Title IX compliance may not find a violation solely because there is a disparity between the gender composition of an educational institution's student constituency, on the one hand, and its athletic programs, on the other hand." *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993).

Title IX's implementing regulations—promulgated by the Department of Health, Education, and Welfare ("HEW")—mandate that institutions provide "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). In determining whether "equal opportunities" are available, one looks to "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1). Stated differently, the regulations require institutions provide

11

"equitable participation opportunities" to both its male and female students. *See Portz v. St. Cloud State Univ.*, 16 F.4th 577, 580 (8th Cir. 2021).

In 1979, HEW published a policy interpretation ("1979 Interpretation") of Title IX. *Id.* at 581. Importantly, the 1979 Interpretation recognized that it was "designed specifically for intercollegiate athletics" and was intended to "provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs." 44 Fed. Reg. 71413 (1979) ("1979 Interpretation") (emphasis added) (hereafter "1979 Interpretation").[5] Indeed, the summary of the 1979 Interpretation notes the "Policy Interpretation represents [HEW's] interpretation of the intercollegiate athletic provisions of Title IX . . . and its implementing regulation." *Id.* (emphasis added). Further, HEW staff visited eight universities to see how the proposed policy would apply in actual practice at individual campuses. *Id.* The 1979 Interpretation provides no indication HEW staff considered how the proposed policy would apply in actual practice to

---

[5] When being directed to prepare guidance by Congress, HEW was specifically tasked to "include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Education Amendment of 1974, Pub. L. No. 93-380 (HR 69), 88 Stat. 484 (Aug. 21, 1974) (emphasis added).

12

school districts or secondary schools, or even whether the 1979 Interpretation was intended to strictly apply to school districts or secondary schools. *See generally* 1979 Interpretation at 71413-71423.

In providing universities and colleges with guidance for complying with Title IX, the 1979 Interpretation created a three-part test—referred to as Prongs One, Two, and Three—used to analyze whether an institution's "participation opportunities" are offered to both sexes in an equal manner. *Portz*, 16 F.4th at 581; 1979 Interpretation at 71418. The three prongs are:

> (1) Whether <u>intercollegiate</u> level <u>participation opportunities</u> for male and female students are provided in numbers <u>substantially proportionate</u> to their respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented among <u>intercollegiate</u> athletes, whether the institution can <u>show a history and continuing practice of program expansion</u> which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among <u>intercollegiate</u> athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

1979 Interpretation at 71418 (emphasis added). Per the 1979 Interpretation, the "overall determination of compliance" with Title IX, however, will be based upon a determination of:

13

Date Filed: 12/18/2023   Page: 21   Appellate Case: 23-3401   Entry ID: 5345299

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature in the . . . opportunities afforded male and female athletes exist in the institution's program as a whole; or

c. Whether disparities in individual segments of the program with respect to . . . opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

1979 Interpretation at 71418.

In 1996, the Office of Civil Rights for the Department of Education ("OCR") issued a letter and memorandum providing clarification regarding the three-part test created in the 1979 Interpretation. U.S. Dep't of Educ., Off. for C.R., Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996) ("1996 Clarification"). Again, the 1996 Clarification was focused on *intercollegiate* athletics, not school districts or secondary schools. *See, e.g.*, 1996 Clarification at p. 1 ("The regulation implementing Title IX and the Department's Intercollegiate Athletics Policy Interpretation published in 1979 . . . specifically address intercollegiate athletics."); *id.* at p. 4 ("OCR is

14

committed to continuing to work in partnership with colleges and universities to ensure that the promise of Title IX becomes a reality for all students.").[6]

The 1996 Clarification clarified that the three-part test furnishes institutions "three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics." *Id.* at p. 4; *see also Portz*, 16 F.4th at 581. The 1996 Clarification then provides additional guidance on how OCR applies the three-part test, the relevant portions of which will be addressed in more detail below.

This Court has recognized the 1979 Interpretation and 1996 Clarification, like other agency documents, receive "respect," but "only to the extent" that they have the "power to persuade." *Berndsen v. N. Dakota Univ.*

---

[6] Relatedly, the Equity in Athletics Disclosure Act, which "requires federally funded universities to report to the Department of Education and make available to students the number of undergraduates and athletes, broken down by sex, as well as sex-segregated data on operating expenses, coach salaries, athletic scholarships, recruiting expenditures, and revenues," *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 968 (9th Cir. 2010), and which serves as a tool to assist in the enforcement of Title IX, does not apply to school districts or secondary schools. *See* 20 U.S.C. § 1092(g)(1) (applying to institutions of "higher education" that have "an intercollegiate athletic program").

*Sys.*, 7 F.4th 782, 786 (8th Cir. 2021) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

### B. The District Satisfies Prong One of the Three-Part Test Because It Offers Equal Athletic Participation Opportunities to Its Female Students

Prong One assesses whether the "participation opportunities" provided to male and female students are "substantially proportionate" in numbers to their respective enrollments. *Portz*, 16 F.4th at 581.

For the 2023-24 school year, after eliminating gymnastics, the District intended to offer its female students participation opportunities in twelve sports: cross country, golf, soccer, tennis, track & field, basketball, wrestling, football (though, often few or no females participate), softball, volleyball, competitive cheer, and competitive dance. For males, the District offered only ten sports: cross country, golf, soccer, tennis, track & field, basketball, wrestling, football, competitive cheer (though, often few or no males participate) and competitive dance (though, often few or no males participate). Practically speaking, the District intended to offer eleven sports to its female students (not counting football), and eight sports to its male students (not counting competitive cheer or dance). Furthermore, female students can participate in any sport offered by the District (including football) while their

Appellate Case: 23-3401    Page: 24    Date Filed: 12/18/2023 Entry ID: 5345299

male counterparts cannot participate in female-designated sports like softball or volleyball. *See* SDCL § 13-67-1. Thus, even without gymnastics, the District's females would have had more sport offerings in which to participate than their male counterparts in the 2023-24 school year.

Moreover, given female students would have had more sport offerings to choose from and given the District historically[7] chooses not to cap various sports (e.g., track & field, cross country, tennis, and golf), the District's female students would have had just as many (and actually more) "opportunities" to participate in sports as their male counterparts in the 2023-24 school year, if one uses any ordinary definition of the term "opportunity."

Unfortunately, in the 2022-23 school year, the District's female students did not utilize the District's athletic opportunities to the same extent as the District's male students. The actual participation numbers for the 2022-23 school year were as follows:

| 2022-23 Participation Nos. | | |
|---|---|---|
| | Male | Female |
| Cross Country | 102 | 40 |
| Golf | 119 | 69 |
| Soccer | 158 | 161 |

---

[7] In light of the district court's ruling, the District has begun preparing to implement caps in certain male sports in order to achieve "substantial proportionality" as defined by the district court to ensure Title IX compliance.

Appellate Case: 23-3401    Page: 25    Date Filed: 12/18/2023 Entry ID: 5345299

| | | |
|---|---|---|
| Tennis | 90 | 71 |
| Track & Field | 479 | 264 |
| Basketball | 232 | 139 |
| Wrestling | 106 | 25 |
| Football | 454 | 1 |
| Softball | 0 | 96 |
| Volleyball | 0 | 167 |
| Competitive Cheer | 1 | 80 |
| Competitive Dance | 1 | 59 |
| Gymnastics | 0 | 57 |
| Total: | 1,742 | 1,229 |

As shown, there were 513 more male participants than female participants, despite female students having all the same and more opportunities. That difference stems largely from five sports: cross country, golf, track & field, tennis, and basketball. Those five sports, which have been core high school sports for decades with strong support from both sexes, created a 439-participant disparity favoring males. No evidence was presented that this disparity is the result of discrimination on behalf of the District. Rather, it is merely the result of the District's male student body choosing to take advantage of the District's sport offerings at a higher rate than its females, and the District's decision not to cap participation in certain sports, which is in alignment with the core belief that all students should be connected to an activity. Track & field, for example, created a 215-participant disparity alone,

Date Filed: 12/18/2023 Entry ID: 5345299    Page: 26    Appellate Case: 23-3401

while basketball, cross country, and golf created a 93-participant disparity, 62-participant disparity, and 50-participant disparity, respectively.

The district court, relying on the 1996 Clarification, determined the disparity between the number of male athletes compared to female athletes was not compliant with Title IX because, in the 2022-23 school year, there was a 7.6 percent[8] disparity between female enrollment and female participation numbers.[9] That's because the 1996 Clarification defines "opportunities" to mean "actual athletes." 1996 Clarification at 3. OCR's reasoning for defining "opportunities" to mean "actual athletes" is "because participation opportunities must be real, not illusory." *Id.*

Notably, neither Title IX itself nor its implementing regulations define "opportunities" to mean actual athletes. *See generally* 20 U.S.C. § 1681; 34 C.F.R. § 106.41. Title IX provides that no person shall be "excluded from participation in" programs. 20 U.S.C. § 1681(c). And the applicable regulation provides that institutions must provide "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41. When it comes to its female

---

[8] In the 2022-23 school year, females made up 48.95 percent of the student body and 41.37 percent of athletes.

[9] If sideline cheer were included, the disparity would be 4.6 percent.

19

students, the District satisfies the plain language of both the statute and the regulation given it does not exclude its female students from participating in any sport and its female students have the same, and actually more, athletic opportunities (as that term is ordinarily defined) than their male counterparts.

OCR's definition of "opportunities" makes sense if there is first a finding that certain athletic opportunities an institution purports to offer are, in fact, illusory. But no such finding was made here; nor was any evidence of such presented or even alleged. As discussed above, the District provided more athletic opportunities (as that term is ordinarily defined) to its female students than its male students. The fact that more of the District's male students took advantage of the District's athletic opportunities—particularly in cross country, golf, track & field, tennis, and basketball—than its female students created a participant disparity. But female students' opportunity to participate in those sports was very much real and not illusory, as demonstrated by those female students who decided to utilize the opportunities.

OCR's definition of "opportunities" also makes sense in the university and college context (which, as a reminder, the 1979 Interpretation and 1996 Clarification were specifically designed to address). University and college athletic programs often have strict restrictions on the number of roster spots

20

Appellate Case: 23-3401     Page: 28     Date Filed: 12/18/2023 Entry ID: 5345299

available in their sporting programs driven largely by financial assistance in the form of scholarships. *See, e.g., Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012) (discussing the NCAA's restrictions on the number of scholarships a school can provide each year); *In re NCAA I-A Walk-On Football Players Litig.*, 2007 WL 951504, at *1, n. 1 (W.D. Wash. Mar. 26, 2007) (discussing NCAA bylaws imposing "annual limits on the number of [sport] scholarships that a member school may award"); Felice M. Duffy, Twenty-Seven Years Post Title IX: Why Gender Equity in College Athletics Does Not Exist, 19 QLR 67, 117 (2000) ("The NCAA sets limits on scholarships per sport—for women's sports ranging from 5-20, and for men's sports ranging from 3.6-13—in an attempt to balance the historically discriminatory allocation of athletic scholarships.").

In fact, OCR's decision to define "opportunities" as actual participants was pulled from the section of the 1979 Interpretation discussing compliance with Section 86.37(c) of the regulation, which addresses athletic financial assistance (scholarships) in colleges and universities. *See* 1996 Clarification at 5 (noting its use of actual participants as the definition of opportunities uses the definition of "participants" found in 44 Fed. Reg. 71415, which is the part of the 1979 Interpretation discussing Section 86.37(c) of the regulation). *See also*

21

1979 Interpretation at 71419 (discussing the historic patterns of *intercollegiate* athletics programs and noting such programs historically emphasize male sports, provide twice as many male sports, and provide far less financial support in the form of scholarships and other resources to female sports).

The District, on the other hand, as a public school district, does not provide any athletic scholarships and allows all its students the opportunity to participate in the various athletic opportunities it provides by choosing not to cap certain sports. Therefore, it makes little sense to define "opportunities" to mean "actual athletes" where, like here, the institution's opportunities are not illusory nor limited in number or by barriers like financial burdens (which are then offset by scholarships in the intercollegiate context).

Importantly, the 1996 Clarification recognizes that, when analyzing Prong One's "substantially proportionate" requirement, the analysis "depends on the institution's specific circumstances and the size of its athletic program." 1996 Clarification at 6. Therefore, whether the institution complies with Title IX is determined on a "case-by-case basis, rather than through use of a statistical test." *Id. See also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014) (holding "there is no magic number at which substantial proportionality is achieved" and that, when assessing substantial

proportionality, courts must "look beyond the raw numbers to the institution's specific circumstances and the size of its athletics program"); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 106-07 (2d Cir. 2012) ("But as the 1996 Clarification makes clear, substantial proportionality is not determined by any bright-line statistical test . . . . Instead, the Clarification instructs that substantial proportionality is properly determined on a 'case-by-case basis' after a careful assessment of the school's 'specific circumstances,' including the causes of the disparity and the reasonableness of requiring the school to add additional athletic opportunities to eliminate the disparity."); *Equity In Athletics v. U.S. Dep't of Educ.*, 639 F.3d 91, 110 (4th Cir. 2011) (same). Also, the overall determination of compliance looks to whether any disparity in opportunities is "unjustified." 1979 Interpretation at 71418.

Here, the district court erred when analyzing Prong One because, while recognizing it needed to make its determination on a case-by-case basis, it ultimately reverted to making its determination solely using a statistical test. (App. 414-18; R. Doc. 26 at 12-16.) The District explained to the district court that the disparity is due to its male students simply utilizing athletic opportunities to a greater extent than its female students, particularly opportunities in cross country, golf, track & field, tennis, and basketball; the

23

disparity had nothing to do with the actual opportunities offered. In response, the district court claimed that argument "relies on the stereotype of males being more interested in sports, which Title IX guidance specifically eschews." (App. 418; R. Doc. 26 at 16.) To the contrary, the raw numbers prove the District's argument. There were more male athletes than female athletes even though females had more sport offerings to choose from, had access to all the same sports the males did, and there were no barriers (e.g., lack of scholarships) the females had to overcome to participate in said sports that the males did not.

The district court's decision is even more troubling in that it put the burden on the District to show the disparity was justified, rather than on the Plaintiffs to show the disparity was unjustified. (App. 418; R. Doc. 26 at 16.) *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) ("The party seeking injunctive relief bears the burden of proving all the *Dataphase* factors.").

In sum, the District is compliant with Prong One of the three-part test. "Look[ing] beyond the raw numbers to the institution's specific circumstances and the size of its athletics program," it is evident that any disparity between female and male participation is due to the District's male students simply

24

utilizing athletic opportunities to a greater extent than its female students. *Ollier*, 768 F.3d at 856. If the 1979 Interpretation "designed specifically for intercollegiate athletics" is applied to school districts and secondary schools like the District or others throughout the United States, Prong One's "substantially proportionate" requirement and analysis must look at the secondary school's "specific circumstances[.]" 1996 Clarification at 6. Here, the specific circumstances and undisputed evidence show the District is compliant with Prong One, as the disparity between male and female participants is not the result of any discrimination on behalf of the District and, thus, is justified.

For these reasons, the District asks this Court to reverse the district court and find the District is compliant with Prong One of the three-part test based on the undisputed evidence. As a result, Plaintiffs are unable to show a likelihood of success on the merits, meaning the district court erred in granting the preliminary injunction preventing the District from eliminating its gymnastics program. *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (recognizing the success on the merits factor is the most important of the four *Dataphase* factors and that an injunction cannot issue if there is no likelihood of success on the merits).

### C. The District also Satisfies Prong Two of the Three-Part Test Because It Has a History and Continuing Practice of Expanding Opportunities for Its Female Students

The District also satisfies Prong Two of the three-part test. Prong Two of the three-part test looks at whether the institution has a history and continuing practice of program expansion responsive to the developing interests and abilities of females. *Portz*, 16 F.4th at 581. The district court correctly found the District has a history of expanding female athletic opportunities, but it erred when it found the District cannot show a continuing practice of expansion because of its decision to eliminate gymnastics. (App. 419-21; R. Doc. 26 at 17-19.)

In the last seventeen years, the District has increased the number of female athletes by 86 percent, going from only 661 female athletes in the 2005-06 school year to 1,229 athletes in the 2022-23 school year. During that time, the District added five new female sports: competitive cheer in the fall of 2008, competitive dance in the fall of 2008, soccer in the fall of 2014, wrestling in the winter of 2021, and softball in the spring of 2023. In just the last five years, the District has increased the number of its female athletes from 937 in the 2018-19 school year, to 1,229 female athletes in the 2022-23 school year. (App. 288; R. Doc. 18 at Ex. A.)

The additions of wrestling and softball in the last two school years resulted in 121 new female participants (160 if one counts middle school wrestlers) in those two sports in the 2022-23 school year. Gymnastics, on the other hand, only had 57 participants (10 of which were middle schoolers) in the 2022-23 school year. In other words, the addition of wrestling and softball combined with the elimination of gymnastics resulted in a net gain of 103 female participants (if one counts the middle school participants for both gymnastics and wrestling). Therefore, the raw, indisputable numbers show the District has a continuing practice of expanding opportunities for its female students.

The district court, however, determined the District cannot satisfy Prong Two because of its decision to eliminate gymnastics. Under the district court's rationale, an institution cannot utilize Prong Two if it decides to eliminate a female sport that has adequate interest to field a team. That rationale lacks legal support. Indeed, the 1996 Clarification provides: "an institution that has eliminated some participation opportunities for the underrepresented sex can still meet part two if, overall, it can show a history and continuing practice of program expansion for that sex." 1996 Clarification at 7. *See also Ollier*, 768 F.3d at 857 (analyzing Prong Two even though institution eliminated a female

sport and ultimately finding the institution failed to satisfy Prong Two because it could not show a steady increase in female athletes over time).

Moreover, the district court found "plaintiffs have presented enough to show a strong interest in gymnastics, and that the District acted counter to the interests of students when they eliminated the gymnastics program." That finding, however, is more apt for analyzing Prong Three of the three-part test, given Prong Three focuses on whether the "interests and abilities of the members of [the underrepresented] sex have been fully and effectively accommodated by the present program." 1979 Interpretation at 71418.

The district court's determination that the District cannot satisfy Prong Two because of its decision to eliminate gymnastics is even more concerning when one considers the three-part test as a whole. The 1996 Clarification makes clear that an institution may not utilize Prong Three if it eliminates a female team that had adequate interest to field a team. 1996 Clarification at 9 ("If an institution has recently eliminated a viable team from the intercollegiate program, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport[.]"). Accepting the district court's rationale would mean that an institution cannot use Prong Three *or Prong Two* if it eliminates a female sport that has adequate interest to field a

Appellate Case: 23-3401     Date Filed: 12/18/2023     Entry ID: 5345299     Page: 36

team (even if, like here, the institution added female sports that resulted in a net gain for overall female participation and an overall expansion of the female program). Stated differently, the district court's rationale indicates that if an institution desires to eliminate a viable female sport, it must comply with Prong One. Given the 1996 Clarification's statement that Prong Two is still available even when an elimination occurs, as well as its statement that the three-part test provides "three *different* avenues of compliance," (1996 Clarification at 2), the district court's finding and rationale related to Prong Two is inconsistent with OCR guidance and Title IX law.

Furthermore, requiring the District to be compliant with Prong One before eliminating a female sport is unsound public policy, particularly considering the District's success over the last seventeen years in increasing the number of female athletes within the District. Courts have recognized that public interest favors an educational institution's ability to "chart its own course in providing athletic opportunities without judicial interference or oversight, absent a clear showing that it is in violation of the law." *Equity in Athletics, Inc.*, 639 F.3d at 524; *Barnes v. Spearfish Sch. Dist. No. 40-2*, 2006 S.D. 108, ¶ 6, 725 N.W.2d 226, 228-29 ("As long as the school board is legitimately and legally exercising its administrative powers, the courts may

29

not interfere with nor supplant the school board's decision making process.").

OCR guidance also recognizes institutions should have "flexibility in choosing

which teams they add." *Mansourian v. Regents of Univ. of California*, 602

F.3d 957, 965-66 (9th Cir. 2010) (citing 1996 Clarification).

Here, the District, which is run by local elected officials, understands

where its resources are best used to increase female participation numbers.

That fact is perhaps best demonstrated by its decision to eliminate one female

sport with only 57 participants while devoting resources to two new female

sports resulting in 160 new participants (a net gain of 103 participants). In a

perfect world, the District could spend unlimited resources on its athletics

programming and offer every female (and male) sport imaginable by its student

body; but that is neither realistic nor legally required.[10] *Id.* at 973 ("Title IX

does not require that a school pour ever increasing sums into its athletic

establishment."). *See also Cohen v. Brown Univ.*, 991 F.2d 888, 898 (1st Cir.

1993) ("Title IX does not require that [an institution] leap to complete gender

---

[10] The District must be responsible in its fiscal management of public funds,
which includes long-term planning. Understanding that capital expenses
ranging from $260,000 to $300,000 were on the horizon for a sport with
declining participation numbers, the District believes it makes sense to allocate
those dollars to programs (e.g., softball and wrestling) better positioned for
growth.

parity in a single bound. Or, if a school has a student body in which one sex is demonstrably less interested in athletics, Title IX does not require that the school create teams for, or rain money upon, otherwise disinterested students[.]").

Requiring compliance with Prong One before eliminating a female sport—which the District's elected officials decided is no longer in the best interest of the District to offer—is also problematic from a public policy perspective because it will lead to the elimination of opportunities for male students who have a track record of utilizing said opportunities, as the District will be forced to cap male sports (which otherwise went uncapped, just like their female counterparts) in order to eliminate a program that has a history of minimal interest (from both participants and coaches) and creates safety concerns for the District.

For all these reasons, the district court erred when it found the District failed to establish compliance with Prong Two.

*　　　　　*　　　　　*

In conclusion, Title IX's effective accommodation requirement is about providing equal opportunities, not forcing equal participation. In the District, any female student can go out for any sport the District offers, even football.

That is not the same for male students, as male students cannot participate in volleyball, softball, or gymnastics. Furthermore, the District has increased female participation numbers by 86 percent in the last seventeen years while female enrollment only increased by 23 percent. And in just the last two years, the District has added two new female sports—softball and wrestling—leading to 160 new female participants, which after reducing for the 57 gymnasts if the gymnastics program is eliminated, results in a net gain of 103 female athletic participants.

For these reasons, the District asks this Court to reverse the district court and find the undisputed evidence shows the District is compliant with Title IX's effective accommodation requirement, even after eliminating its gymnastics program. As a result, Plaintiffs are unable to show a likelihood of success on the merits, meaning the district court erred in granting the preliminary injunction preventing the District from eliminating its gymnastics program. *Jet Midwest Int'l Co.*, 953 F.3d at 1044 (recognizing the success on the merits factor is the most important of the four *Dataphase* factors and that an injunction cannot issue if there is no likelihood of success on the merits).

## II. The District Court Erred by Not Requiring Security from Plaintiffs When It Issued a Preliminary Injunction against the District

Whether the district court erred by not requiring security from Plaintiffs is reviewed under an abuse of discretion standard, and this Court will reverse the district court if it failed "to require an adequate bond or to make the necessary findings in support of its determinations." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). Here, the district court did not require any bond and failed to make findings to support that determination. Thus, it abused its discretion. *See Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989) (concluding district court erred in failing to require the posting of a sufficient bond to protect the defendant in the event it prevailed on the merits).

Under Federal Rule of Civil Procedure 65(c), a district court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added). The language of Rule 65(c) is unambiguous and unequivocal, as it clearly states preliminary injunctive relief is available "only if" security is posted. Not surprisingly, "[c]ourts in this circuit have almost always required a bond before issuing a preliminary injunction, but exceptions have been made where the defendant has not objected to the failure

33

to require a bond or where the damages resulting from the wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). This includes cases involving allegations of Title IX violations. *See Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1106 (S.D. Iowa 2020) (requiring plaintiffs to post bond in the amount of $360,000 where court granted preliminary injunction enjoining university from eliminating women's swimming and diving team). Security should be imposed "in an amount that fairly protects the [defendant] should it be ultimately found that the [defendant] has been wrongfully enjoined." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 373 (8th Cir. 1991).

Here, the District requested security in the amount of $92,000, as that was the amount it had budgeted for the 2023-24 gymnastics program before cutting the program. (App. 285; R. Doc. 18 at 9.) The District renews that request now.

Appellate Case: 23-3401    Page: 42    Date Filed: 12/18/2023 Entry ID: 5345299

## **CONCLUSION**

For the reasons stated herein, the District requests this Court find the District is compliant with Title IX's effective accommodation requirement and reverse the district court's entry of preliminary injunctive relief in its entirety.

Moreover, the District requests this Court require security from Plaintiffs in the amount of $92,000 consistent with Federal Rule of Civil Procedure 65(c).

Dated at Sioux Falls, South Dakota, this 15th day of December, 2023.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

Reece M. Almond
206 West 14th Street
PO Box 1030
Sioux Falls, SD 57101-1030
Telephone: (605) 336-2880
Facsimile: (605) 335-3639
*Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 6,801 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Office 365 with 14-point Times New Roman.

3.    A digital version of the brief in Portable Document Format (PDF) is being provided to the clerk and to each party separately represented by counsel pursuant to 8th CIR. R. 28A(d) and has been scanned for viruses and is virus-free.

Dated at Sioux Falls, South Dakota, this 15th day of December, 2023.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

_____
Reece M. Almond
206 West 14th Street
PO Box 1030
Sioux Falls, SD 57101-1030
Telephone: (605) 336-2880
Facsimile: (605) 335-3639
*Attorneys for Appellant*

Appellate Case: 23-3401    Page: 44    Date Filed: 12/18/2023 Entry ID: 5345299

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 15th day of December, 2023, I electronically filed the foregoing Appellant's Brief with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are CM/ECF users and that service will be accomplished by the CM/ECF system or by United States mail, postage prepaid.

Reece M. Almond

37